## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## DELTA DIVISION

JIMMY D. DRINKARD                                                                     PLAINTIFF

V.                                                                 CAUSE NO.: 2:08CV9-SA-SAA

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY                      DEFENDANT

## MEMORANDUM OPINION

This cause comes before the Court on the Defendant's Motion for Summary Judgment [20]. The Plaintiff has responded in opposition to the motion, and the Court, having considered the memoranda and submissions of the parties, along with the entirety of the claims file, finds the following:

*Factual and Procedural Background*

Effective January 1, 2001, Hartford Life and Accident Insurance Company ("Hartford") issued a long-term disability policy to the employees of Quebecor. Under the terms of the policy, Hartford retained the "discretionary authority to determine eligibility for benefits and to interpret the terms and provisions of the policy." The policy also provides that an employee is eligible to receive a "Monthly Benefit" "for each month of disability which continues after the Elimination Period." Moreover, for employees such as the plaintiff, who is designated a "Class 1" employee, the policy defines "disabled" or "disability" as follows:

> "Disability" means that during the Elimination Period and the following 12 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:
>
> 1. continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and
>
> 2. not working for wages or any occupation for which You are or become qualified by education, training or experience.

After the Monthly Benefit has been payable for 12 months, "Disability" means that Injury or Sickness causes physical or mental impairment to such a degree that You are:

> 1. continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and

> 2. not working for wages in any occupation for which You are or become qualified by education, training or experience.

Jimmy Drinkard applied and was approved for long-term disability benefits as of February 12, 2005, for his diabetes, peripheral neuropathy, and coronary disease. From February 12, 2005, until February 28, 2007, Hartford paid to plaintiff a monthly benefit as provided by the policy qualifying as disabled.

On February 23, 2007, Hartford sent a letter to Drinkard discontinuing the long-term disability benefits they had been providing because of their determination that Drinkard no longer met the definition of "disabled" under the policy. Particularly, the letter stated that Drinkard was no longer disabled from "any occupation" as required by the policy, and the benefits were terminated as of the date of the letter.

Plaintiff appealed Hartford's decision and presented additional evidence to be considered on review. That appeal was denied and Hartford sent a letter outlining the reasons for denial and indicating that Drinkard had a right to bring a civil action under Section 502(A) of the Employee Retirement Income Security Act ("ERISA").

Accordingly, Drinkard filed a claim in state court asking for contractual and extracontractual damages to be awarded against Hartford for failing to make benefit payments to Drinkard. Hartford removed this case to federal court, and Plaintiff has conceded that this claim is a claim for benefits

under ERISA, and that ERISA preempts all other state law claims Drinkard attempted to bring forth.

The parties submitted, and the Court approved, an Agreed Order dispensing with the Final Pretrial

Conference and trial scheduled in this case. Both parties have agreed that the Court should decide

this matter without trial and based on the motion for summary judgment, briefs, response, pleadings

and case file submitted by the parties.

*Standard of Review*

The summary judgment standard applied to ERISA claims is unique. This is because this

court acts in an appellate capacity reviewing the decisions of the administrator. In Firestone Tire &

Rubber Company v. Bruch, the United States Supreme Court discussed which of two possible

standards of review, *de novo* or abuse of discretion, should apply to ERISA actions. 489 U.S. 101,

115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). The Firestone Court stated:

> a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. . . . Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "facto[r] in determining whether there is an abuse of discretion."

Id. (citing the Restatement (Second) of Trusts § 187, Comment *d* (1959)).

The abuse of discretion standard also is referred to as an arbitrary and capricious standard,

and the United States Court of Appeals for the Fifth Circuit has noted that there is only a "semantic,

not a substantive, difference" between the arbitrary and capricious and the abuse of discretion

standards in the ERISA benefits review context. Meditrust Fin. Servs. Corp. v. The Sterling Chems.,

Inc., 168 F.3d 211, 214 (5th Cir.1999). Under this standard, when "the plan fiduciary's decision is

supported by substantial evidence and is not arbitrary and capricious, it must prevail." Corry v.

Liberty Life Assurance Co. of Boston, 499 F.3d 389, 397 (5th Cir. 2007). A decision is arbitrary, and thus not supported by substantial evidence, if "made without a rational connection between the known facts and the decision or between the found facts and the evidence." Meditrust, 168 F.3d at 215 (citing Bellaire Gen. Hosp. v. Blue Cross Blue Shield, 97 F.3d 822, 828-29 (5th Cir. 1996)).

When the plan fiduciary is also the insurer, the court's review of the insurer's exercise of discretion must take into account the conflict of interest that the dual roles create. Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan, 493 F.3d 533, 538 (5th Cir. 2007). Even so, the conflict is only one of several considerations. Metro. Life Ins. Co. v. Glenn, — U.S. —, 128 S. Ct. 2343, 2351, 171 L. Ed. 2d 299 (2008). The Fifth Circuit in Vega v. National Life Insurance Services, Inc. articulated how courts are to measure this factor. 188 F.3d 287, 296-299 (5th Cir. 1999). Courts are to apply a "sliding scale" standard, in which the abuse of discretion standard applies, but less deference is granted the administrator in proportion to the administrator's apparent conflict. Id. at 296. "The greater the evidence of conflict on the part of the administrator, the less deferential the abuse of discretion standard will be." Id. at 297.

*Discussion and Analysis*

The plaintiff challenges Hartford's denial of benefits and argues that Hartford abused its discretion in terminating Drinkard's long-term disability benefits. After a thorough review of the claim file, including all medical records, independent medical examinations, as well as the surveillance videos, the Court is of the opinion that Hartford did not abuse its discretion in terminating Drinkard's long-term disability benefits.

As noted above, after a claimant received monthly benefits for twelve months, he is subject to further evaluation by the insurer as the definition of "disabled" changes as of that date. Here,

4

Drinkard fulfilled the elimination period, which lasted 180 days, and was notified by Hartford that to continue receiving benefits after August 11, 2006, he must be unable to engage in *any occupation* for which he was qualified. On February 23, 2007, Hartford sent the letter denying continuing coverage to Drinkard and cited the following as supporting their decision:

1. Functional Assessment Tool completed by Dr. Michael DeShazo, Plaintiff's treating neurologist dated March 31, 2006. In that report, Dr. DeShazo noted that Drinkard was unable to perform sedentary work. Further, Dr. DeShazo commented that in an eight hour day, Drinkard would be able to stand for one hour, walk for one hour, sit for six hours and lift or carry ten pounds.

2. Claimant Questionnaire completed by Drinkard on April 4, 2006. Drinkard admitted on this form that he spent his day watching television, sleeping, getting the mail, fixing lunch, and sitting outside.

3. Video surveillance conducted on June 19 and 20, 2006, and July 16 and 17, 2006. On June 19 and 20, Drinkard was filmed standing and walking for approximately eight minutes while shopping, carrying a basket with unidentified items inside, driving, and sitting for approximately two hours in a theater watching a movie. On July 17, Drinkard was recorded going to Wal-Mart to shop, driving to and stopping at a bread shop, and pulling into a gas station to fill a gas tank and buy ice. Drinkard then traveled back to his house to mow the lawn. During that portion of the video surveillance, Hartford noted that the plaintiff was observed standing and walking for approximately thirty minutes while shopping, bending, lifting various items, driving, lifting a gas can after filling it with gas, entering and exiting his vehicle, leaning over while sitting and throwing a branch, and mowing the yard while seated for at least thirty minutes.

4. Continuation of Disability Statement taken in a face-to-face interview between a Hartford

investigator and Drinkard on August 21, 2006. In this statement, Drinkard admitted that the activities recorded on the video surveillance were close to his current level of functioning and accurately depicted his current restrictions and limitations. Further, Drinkard noted that he was capable of walking for up to ten minutes, shopping for up to an hour with a motorized cart, shopping for fifteen minutes without a cart, standing for fifteen minutes, lifting and carrying a maximum of eighty-five pounds, bending to ninety degrees, twisting, pushing and pulling items that offer light resistance, reaching, traversing a small flight of stairs, sitting for up to two hours, and driving for up to twenty minutes.

5. Medical Records from Dr. DeShazo, Plaintiff's treating neurologist; Dr. Stacy Smith, Plaintiff's treating cardiologist; and Dr. Robert Kraus, Plaintiff's treating internalist, all dated January 1, 2005 through February of 2007. These records indicate that Plaintiff has diabetes, coronary artery disease, cardiomegaly and peripheral neuropathy. Dr. Smith's notes indicated that due to the peripheral neuropathy, Drinkard was no longer able to walk any distance and was not exercising as of November of 2005.

6. Functional Assessment conducted by Hartford's Medical Case Manager. Hartford's Medical Case Manager provided to Plaintiff's treating physicians a copy of the video surveillance and Drinkard's subsequent comments regarding his limitations for their comments. Dr. Smith deferred her judgment of Drinkard's work restrictions to Drs. DeShazo and Kraus. After several calls, Dr. Kraus never responded to the Medical Case Manager's request. Dr. DeShazo stated that he did not agree with Hartford's assessment that Drinkard retained the residual functional capacity equal to that which is required of a seated type function. Dr. DeShazo reiterated that he did not feel Drinkard was capable of full time work.

6

7. Independent Record Review conducted by Medical Advisory Group's Dr. William Sniger, Board Certified in Physical Medicine and Rehabilitation and Spinal Cord Injury Medicine, dated February 16, 2007. Dr. Sniger also contacted Plaintiff's treating physicians to discuss Drinkard's condition. Dr. DeShazo noted that Drinkard's neuropathic pain was more limiting than the physical manifestations. He again commented that he did not feel Drinkard had full time work capacity. After reviewing all information on file and discussing Drinkard's medical history with his treating physicians, Dr. Sniger concluded that

> the preponderance of objective information does not support that the claimant is unable to perform full time seated work with only brief or intermittent periods of walking/standing; allowing for full use of the upper extremities; lifting/carrying 0-10 pounds frequently and up to 85 pounds occasionally; sitting for the majority of the work day with the opportunity to change positions. No other restrictions are indicated.

8. Assessment of Employability dated February 19, 2007. Based on the restrictions proposed by Dr. Sniger, as well as Drinkard's education, training and experience, the Hartford Vocational Case Manager deemed Drinkard to be readily employable in the following alternative occupations: Mail Distribution Scheme Examiner (Government Services) $22.93/hour; Chief Order Dispatcher (Utilities) $17.26/hour; Chief Meter Reader (Utilities) $17.26/hour.

After receiving the letter of denial of long-term benefits, Drinkard asserted his right to appeal that decision. Moreover, Drinkard asserted the wrong decision was reached because Hartford failed to give enough weight to his treating physicians' reports. He included three statements from his doctors reiterating their conclusions as to his limitations, medications, and recent procedures. Further, Drinkard asserted that he knew he was being watched by Hartford's surveillance team; therefore, he was trying to show them what he could do.

Hartford completed their appeal review over two months later and determined that the correct

decision as to termination of long-term disability benefits was reached initially. On appeal, Hartford

reviewed all medical records, including updated information and statements of the treating

physicians; the video surveillance performed in June and July of 2006; the follow-up personal

interview instigated on August 21, 2006; and Dr. Sniger's original independent medical review.

Hartford determined that another independent comprehensive medical review was necessary in order

to complete the appeal evaluation. Therefore, they enrolled Dr. Stephen Vanna, a Board Certified

Neurologist, to review Drinkard's medical files, consult with his treating physicians, study the

surveillance tapes, and analyze the claimant's statements made following the surveillance. Based

on all the evidence, Dr. Vanna's medical opinion was that the evidence did not support that Drinkard

was prevented from performing at least full-time sedentary work as of February 23, 2007. Hartford

concluded:

> While we do not dispute that you may have restrictions and limitations supported by
> the medical evidence in file due to your multiple medical conditions, the evidence
> does not support that such restrictions and limitations would have prevented or
> impaired your ability to perform at least full-time sedentary work as of 2/23/2007.
> The evidence obtained during the surveillance period is indicative of your ability to
> perform activities of daily living independently, which indicates that your functional
> status is not less than sedentary capacity. Your reported abilities during the interview
> with the claims investigator on 8/21/2006 are also indicative that your functional
> abilities are not less than sedentary capacity.

In response to the motion for summary judgment, Drinkard asserts that the policy definition

of "disabled" or "disability" is ambiguous. Moreover, Drinkard asserts that Hartford should have

accorded more weight to his treating physicians' diagnoses and medications. Drinkard also accuses

Hartford of failing to thoroughly investigate his claim and overstate his actions on the video

surveillance.

According to the policy, the elimination period is a 180 day period which begins the day the claimant becomes disabled. If the claimant is disabled continuously throughout the elimination period, the claimant qualifies for monthly benefits after the180 day elimination period. For the first twelve months of payment, "disability" under the policy means that the claimant has a physical or mental impairment which prevents them from performing the material and substantial duties of the claimant's regular occupation. The policy further provides that after the monthly benefits have been paid for twelve months, the definition of "disability" is altered to include any physical or mental impairment to such a degree of severity that the claimant is unable to "engage in any occupation." Additionally, the policy notes that "[w]e send You a payment each month up to the maximum duration of benefit based on Your age at Disability so long as You continue to be Disabled according to the terms of the policy." Accordingly, the language of the policy is clear and unambiguous. Employers have "large leeway to design disability and other welfare plans as they see fit." The Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). During the first twelve months of benefit payments, the claimant must be unable to perform his regular job duties. After the initial twelve month period, to remain "disabled" under the policy, the claimant must be unable to perform any job.

The United States Supreme Court has held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Nord, 538 U.S. at 834, 123 S. Ct. 1965. Thus, the Hartford administrators had no duty to accord extra respect to Drinkard's treating physicians' opinions. Moreover, if Drinkard believed Hartford failed to consider the effects of his

medications on his disability, he is charged with producing evidence showing such a link. See

Perdue v. Burger King Corp., 7 F.3d 1251, 1254 (5th Cir. 1993) (the plaintiff bears the burden of

demonstrating that he is entitled to benefits).

Although the court reviews the administrator's decision for an abuse of discretion, the Fifth

Circuit has also stated that an administrator's decision to deny benefits must be based on record

evidence. See Lain v. UNUM Life Ins. Co. of Am., 279 F.3d 337, 342 (5th Cir. 2002) (citation

omitted). In Vega, the Fifth Circuit explained that this requirement does not create a per se duty to

reasonably investigate a claim for benefits. 188 F.3d at 298; see also Dramse v. Delta Family-Care

Disability & Survivorship Plan, 269 Fed. Appx. 470, 479 (5th Cir. 2008). The court reasoned that

> [t]here is no justifiable basis for placing the burden solely on the administrator to
> generate evidence relevant to deciding the claim, which may or may not be available
> to it, or which may be more readily available to the claimant. If the claimant has
> relevant information in his control, it is not only inappropriate but inefficient to
> require the administrator to obtain that information in the absence of the claimant's
> active cooperation.

Id. Of course, the lack of a per se rule does not excuse the administrator entirely. While "the

administrator has no duty to contemplate arguments that could be made by the claimant, we do

expect the administrator's decision to be based on evidence, even if disputable, that clearly supports

the basis for its denial." Id. at 299. However, federal courts owe "due deference to the

administrator's factual conclusions that reflect a reasonable and impartial judgment." Pierre v.

Conn. Gen. Life Ins. Co., 932 F.2d 1552, 1562 (5th Cir. 1991).

Based on the facts and evidence in the record, Hartford did not abuse its discretion in

terminating the Plaintiff's long-term benefits.

In February of 2005, Dr. Kraus noted, "I have discussed with him regarding disability and

feel like he is probably permanently disabled from his primary illness including his advanced diabetic neuropathy." One month later, Kraus states, "[Drinkard] is permanently disabled because of his severe peripheral sensory diabetic neuropathy with gait disturbance. He is unable to walk more than 10 feet." Another of Drinkard's treating physicians, Dr. DeShazo, wrote in May of 2005, "He has severe peripheral neuropathy and this is very painful for him. . . . I feel that he is permanently disabled from any type of employment due to his peripheral neuropathy." Dr. DeShazo further opined about Drinkard's condition in July of 2005: "He really can only spend an hour or two on his feet at a time and then needs to rest. He is able to drive very short distances, maybe 10-15 miles at the most because of his neuropathy." In November of that year, Dr. Stacy Smith updated Dr. Kraus on Drinkard's condition by commenting, "As you know, Jimmy's activity is markedly limited by his peripheral neuropathy. He is no longer able to walk any distance, and thus he is not exercising." On March 30, 2006, Dr. DeShazo wrote in a functional assessment of the plaintiff that between his evaluation in July of 2005 and the present, he did not expect any improvement in Drinkard's limitations. He further defined those limitations as being able to stand for one hour, walk for one hour and sit for six hours in an eight hour day, and being able to lift or carry ten pounds for ten to fifteen minutes.

During the summer of 2006, Drinkard was recorded by video surveillance walking through Wal-Mart for almost thirty minutes, grocery shopping with a basket of items, sitting through a movie, moving a tank of gas from the ground into the bed of a truck, mowing his lawn for at least thirty minutes and reaching from his lawnmower to the ground to retrieve a branch which he then threw over a fence. After reviewing the recordings, the Court is not persuaded that Hartford overstated Drinkard's abilities in their evaluation of his claim. Moreover, to the extent Drinkard's

treating physicians' limitations are not analogous to Drinkard's abilities as revealed by the surveillance videos, it was not an abuse of discretion for Hartford to rely on either. See Vercher v. Alexander & Alexander Inc., 379 F.3d 222, 232 (5th Cir. 2004) (under substantial evidence review, choosing one of two or more reasonable interpretations does not constitute an abuse of discretion).

In fact, when he is subsequently questioned about these activities and his limitations, Drinkard admits that "[t]he surveillance video is pretty close to my current level of functionality and accurately shows my current level of restrictions and limitations." On a typical day, Drinkard admitted to being able to fix breakfast for his wife, sit on the couch and watch television, wash and dry clothes, fix supper, ride his golf cart over seven acres of land, vacuum, load and unload the dishwasher, mow the lawn, cut his pasture on a tractor, and run quick local errands.

The Hartford investigator who interviewed Drinkard also made several notes about Drinkard's actions and motions. He noted that during the three hour interview, Drinkard "displayed minimal signs of pain or discomfort." However, according to the investigator, the claimant did grunt as he rose to his feet and rubbed his ankles and lower legs frequently during the first half of the interview. The investigator observed that Drinkard went from a seated position to a standing position in one motion and did so six times throughout the interview process. Overall, the investigator noted a little stiffness in Drinkard's motions initially, but stated that he loosened up as the interview progressed and displayed movements like those in the video surveillance.

Dr. DeShazo viewed the video surveillance of Drinkard in January of 2007, and disagreed with Hartford's new assessment of function as to the claimant. Hartford had determined based on the surveillance and Drinkard's own admissions with regard to his limitations that he was capable of performing a full time seated function with intermittent walking and standing. Moreover,

Hartford assessed that Drinkard would have full use of his upper extremities, could lift or carry no more than ten pounds on a frequent basis or eighty-five pounds occasionally. DeShazo disagreed and stated that based on Drinkard's severe peripheral neuropathy that chronic pain is a major problem for Drinkard such that he "doubt[s] that he could hold any employment even sedentary."

Hartford referred the case to an independent medical examiner, Dr. Sniger, who produced a report on February 16, 2007. That report found based on Dr. Sniger's review of Drinkard's medical records, statements from his treating physicians, and the surveillance videos that "the preponderance of information does not support the claimant's alleged inability to perform full-time work from a physical perspective." Moreover, Sniger reported the following:

> In answer to your specific questions: The preponderance of objective information does not support that the claimant is unable to perform full-time seated work with only brief or intermittent periods of walking/standing; allowing for full use of the upper extremities, i.e. fingering, handling, typing and reaching; lifting/carrying 0-10 pounds frequently/up to 85 pounds occasionally; sitting for the majority of the work day with the opportunity to change positions. No other restrictions are indicated.

On appeal, a second independent medical examination was performed by another board-certified physician, Dr. Vanna. Dr. Vanna's report dated June 1, 2007, noted that he relied on all medical records submitted to the insurance company, communications with Drinkard's treating physicians, surveillance videos and the claimant's interview. After reviewing all the materials, Dr. Vanna concluded that the "facts do not support enough information to prevent the claimant from performing at least full time sedentary work as of 2/23/2007." Moreover, he noted that "[n]o restrictions or limitations are noted that would prevent the capability of full-time sedentary work as of 2/23/2007."

Thus, Hartford's decision was based on substantial evidence, namely the surveillance videos,

Drinkard's own admissions, and two independent medical evaluations.  Hartford's decision to terminate Drinkard's long-term disability benefits was rationally connected to the known facts, and they were not arbitrary or capricious in their determination.  "Once there is more than one possible conclusion that can be reached from the record evidence, the Plan's selection of a competing possibility must be affirmed." <u>Dramse</u>, 269 Fed. Appx. at 480 (citing <u>Vercher</u>, 379 F.3d at 231-32).  Thus, the plan administrator's decision is affirmed and this case is dismissed.

SO ORDERED, this the __26th__ day of January, 2009.

**/s/ Sharion Aycock**
**U.S. DISTRICT JUDGE**